# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7821 | **DATE** | 8/7/2001 |
| **CASE TITLE** | American Society of Consultant Pharmacists, et al. vs. Jackie Garner | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter Amended Memorandum Opinion and Order.** Appendix A to the Amended Memorandum Opinion and Order is under seal. Plaintiff's motion for a preliminary injunction [doc. # 24-1] is denied. This amended opinion does not revise the substance of the original opinion, and thus is entered *nunc pro tunc* to 04/06/01.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | AUG - 8 2001 | |
| | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | 8/7/2001 | |
| | Copy to judge/magistrate judge. | date mailed notice | |

JJK  courtroom deputy's initials

FD-7
FILED FOR DOCKETING
01 AUG -7 AM 11: 42

docketing deputy initials

JJK77

Date/time received in central Clerk's Office

mailing deputy initials

**Document Number**

63

AMERICAN SOCIETY OF CONSULTANT )
PHARMACISTS, *et al.* )
)
           Plaintiffs,[*] )
)
    v. )
)
)
JACKIE GARNER, her official capacity as )
Director of the Illinois Department of )
Public Aid, )
)
           Defendant.[1] )

**DOCKETED**

AUG - 8 2001

No. 00 C 7821

Magistrate Judge Sidney I. Schenkier

**DOCKETED**

AUG - 8 2001

## <u>AMENDED MEMORANDUM OPINION AND ORDER</u>[2]

On December 15, 2000, Illinois changed the formulas it uses to pay providers of prescription drug services to Medicaid recipients. This rate change, implemented pursuant to an emergency rule, is currently in effect. Anticipating this change, on December 13, 2000, the plaintiffs, the American Society of Consultant Pharmacists and 20 pharmacies, filed this lawsuit against the Illinois

---

[*]This opinion originally issued under seal on April 6, 2001. The Court now releases this opinion publicly. However, in order to maintain the confidentiality of information concerning the market share and profitability of various plaintiffs (information which is not public and has not been shared among the plaintiffs), at times in this public opinion the Court will refer to various entities by a letter denominator (*e.g.,* "Pharmacy A"). In an appendix to the opinion, which will be kept under seal, the Court will identify which entities correspond to which letter designations. This amended opinion, dated August 7, 2001, does not revise the substance of the original opinion, and thus is entered *nunc pro tunc* to April 6, 2001. *See Kusay v. United States*, 62 F.3d 192, 193 (7th Cir. 1995).

[1]At the time this action was filed, Ann Patla was the Director of the Illinois Department of Public Aid. On March 1, 2001, Jackie Garner replaced Ms. Patla in that position and thus, pursuant to Fed. R. Civ. P. 25(d)(1), is automatically substituted as the defendant, as successor to Ann Patla.

[2]By the parties' consent, on January 24, 2001, the case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings in this case, and to enter final judgment (Doc. ## 40, 41, 42).

Department of Public Aid ("IDPA") and its Director, in her official capacity. In earlier decisions in this case, the plaintiffs' requests for a temporary restraining order were denied.[3] In addition, in a Memorandum Opinion and Order dated February 27, 2001, this Court dismissed plaintiffs' two supplemental state law claims against all defendants, and their Medicaid Act claim against the IDPA. *See ASCP v. Patla*, No. 00 C 7821, 2001 WL 19747 (N.D. Ill., Feb. 27, 2001).

What remains in the case, therefore, is plaintiffs' claim against the Director of IDPA in her official capacity, pursuant to 42 U.S.C. § 1983, that the IDPA's new reimbursement formulas violate the Federal Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A). The plaintiffs have moved for a preliminary injunction on this claim (doc. # 24-1), requesting that the Court enjoin the application of the new reimbursement formulas pending a trial on the merits. The parties have agreed to submit the matter for decision on the papers, without the need for in-court testimony. After careful review of the parties' submissions and the oral argument heard on March 26, 2001, the Court finds that the law of this Circuit, as articulated in *Methodist Hospitals, Inc. v. Sullivan,* 91 F.3d 1026 (7th Cir. 1996), requires the Court to deny the plaintiffs' motion for a preliminary injunction.

The Court sets forth below the findings of fact and conclusions of law that constitute the basis for the denial of plaintiffs' motion for a preliminary injunction. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes in whole or in part a finding of fact, the Court adopts it as such. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

---

[3]On December 15, 2000, after receiving briefs and hearing oral argument, the Honorable Charles R. Norgle, Sr. – hearing the matter as emergency judge – denied plaintiffs' motion for a temporary restraining order (doc. # 27; *see also* 12/15/00 Tr. 37-41). Thereafter, on December 21, 2000, the assigned district judge – the Honorable Blanche M. Manning – denied plaintiffs' motion to reconsider the denial of a temporary restraining order (doc. # 32).

**I.**

For purposes of this preliminary injunction motion, the defendant has stipulated to the allegations in the amended complaint, the exhibits thereto, and the supplements filed by the plaintiffs (*see* 01/03/01 Tr. 13-14, 18). The defendant has elected not to provide any evidentiary submissions. As a result, the following findings are drawn from the Court's analysis of plaintiffs' submissions.

**A.    The Parties.**

1.    The plaintiff American Society of Consultant Pharmacists ("ASCP") is a national trade association, which is comprised of a group of pharmacies that provide Medicaid services in Illinois. The other named plaintiffs (collectively, "the Medicaid Pharmacies") all are members of the ASCP (Am. Compl. ¶¶ 1-21). The Medicaid Pharmacies in Illinois employ approximately 1533 employees, including over 663 hundred professionals, including 178 pharmacists and 465 pharmacy technicians (Am. Compl. ¶ 79). The plaintiffs include the following individual pharmacies:

a.    Enloe Drugs; Enloe Drugs d/b/a Enloe PCI Prescription Center; Enloe Drugs, Inc. d/b/a Omnicare of the Quad Cities; Nihan & Martin, Inc. d/b/a Nihan & Martin Pharmacy; JHC Acquisition, Inc. d/b/a Jacobs Healthcare Systems; Weber Medical Systems, Inc. d/b/a Omnicare Infusion Services; Dixon Pharmacy, Inc. d/b/a Dixon Pharmacy; Dixon Pharmacy, Inc. d/b/a Dixon Main Street Pharmacy; Niv Acquisition Corp. d/b/a Denman Pharmacy; Home Pharmacy Services, Inc. d/b/a Omnicare of Southern Illinois; Home Pharmacy Services; Interlock Pharmacy

System, Inc. d/b/a Inerlock Pharmacy Services; Care Pharmaceutical Services, Inc. (these 15 pharmacies are collectively referred to as "Omnicare");

b.    Pharmerica Drug Systems, Inc.;

c.    SunScript/HRA LLC of Burr Ridge, Illinois; and

d.    Neighborcare Pharmacy Services, Inc. d/b/a Neighborcare Elgin; Neighborcare Pharmacy Services, Inc. d/b/a Neighborcare Hickory Hills; Neighborcare Pharmacy Services, Inc. d/b/a Neighborcare Monticello (these three pharmacies are collectively referred to as "Neighborcare").

2.    Medicaid pays for pharmaceuticals and related services for approximately 60-65 percent of residents living in Illinois nursing homes, assisted living facilities, and community integrated living arrangements ("CILAs"). Since there are approximately 100,000 residents in Illinois living in those facilities, there are approximately 60,000 to 65,000 of those residents whose care is paid for by Medicaid. The plaintiff pharmacies provide all pharmacy services for approximately 83 percent of these residents, or approximately 50,000-54,000 individuals (Am. Compl. ¶ 20; Pharmacy A Aff. ¶ 19). The record does not disclose what pharmacies service the remaining 17 percent of this Medicaid population, where those pharmacies are located, or what geographic areas they serve.

3.    While the plaintiffs in this case have adopted for themselves the label "Medicaid Pharmacies," that is something of a misnomer, because at least some percentage of their businesses also serve private pay individuals. The amount varies from plaintiff to plaintiff. *See, e.g.,* Pharmacy A Aff. ¶ 25 (35 percent of Pharmacy A's business serves non-Medicaid

recipients); Pharmacy B's Aff. ¶ 7 (37 percent of Pharmacy B's patients are non-Medicaid recipients); Pharmacy C's Aff. ¶ 6 (15 percent of Pharmacy C's patients are Medicaid recipients). As for Pharmacy D and the non-party specialty pharmacies who serve this Medicaid population, we do not know the breakdown of their business between Medicaid and non-Medicaid recipients.

4.  "There is a difference in the population mix served by [plaintiffs] and the traditional retail pharmacies" (Supp. Pharmacy A Aff. ¶ 6c). The traditional retail pharmacies serve a much lower percentage of Medicaid recipients vis-a-vis its total customer base than do the plaintiffs (*Id.*). Moreover, traditional retail pharmacies serve non-institutionalized Medicaid recipients who require a far lower level of pharmacy services than the institutionalized recipients served by plaintiffs (*Id.* ¶ 6d). Thus, the cost of services provided by traditional retail pharmacies is much lower than the cost of the services provided by the plaintiffs (*Id.* ¶ 6e).

5.  The defendant is the Director of the Illinois Department of Public Aid ("IDPA"), who is sued in her official capacity only (Am. Compl. ¶ 22). The IDPA administers the Illinois Medical Assistance Program (the "Medicaid Program") and contracts with pharmacies, including the Medicaid Pharmacies, to provide prescription and non-prescription drugs and related products and services to medical assistance beneficiaries (hereafter, "Medicaid recipients") (Am. Comp. ¶ 23).

6.  The Medicaid recipients who live in nursing homes, assisted living facilities and CILAs are not parties to this action. However, to the extent that the IDPA's new reimbursement

formula may affect their access to the services rendered, these Medicaid recipients have a stake in the outcome of this litigation (Am. Compl. at 2).

**B.      The Medicaid Program.**

7.      The State of Illinois provides medical assistance to Medicaid recipients enrolled in the Medicaid Program pursuant to the provisions of Title XIX of the Social Security Act, 42 U.S.C. § 1396-1396v (the "Medicaid Act") (Am. Compl. ¶ 30). The Medicaid Program is a cooperative state and federal program whereby the federal government provides funds to the states to assist the poor, elderly, and disabled to receive medical care, prescription and non-prescription drugs, and related services (*Id.*, ¶ 28). States may elect to opt in or out of the Medicaid Program. States that opt into the program must submit a State Plan ("Medicaid State Plan") to the United States Department of Health and Human Services ("DHHS") for approval, describing the policies and methods used to set reimbursement rates for each type of service included in the program. The provision of drugs, pharmaceuticals, and related services are one such type of service. A state must also submit for approval to the DHHS any proposed amendments. Both the Medicaid State Plan and any amendments must meet federal requirements. 42 U.S.C. §§ 1396a(a) and (b); 42 C.F.R. § 430.10, 430.12 (*Id.*, ¶ 29).

8.      The IDPA is the designated state Medicaid agency and, as such, it is responsible for administering, adopting, implementing, and amending the Illinois Medicaid State Plan in accordance with the requirements of the Medicaid Act (Am. Compl. ¶ 31). Illinois has opted to cover prescription and non-prescription drugs and related services in its Medicaid State Plan (*Id.*, ¶ 35).

6

9. Medicaid prescription drug reimbursement to pharmacies like the Medicaid Pharmacies is a function of two components: a formula to cover the cost of the prescription drug product and a dispensing fee (Am. Compl., ¶ 36). The drug product component cost is the cost of the drug as determined by a Medicaid formula which estimates the acquisition cost (Am. Compl. ¶ 38). For some providers, such as Omnicare, the dispensing fee takes into account the costs associated with filling the prescription such as unit dose packaging, pharmacists' review, delivery, pharmacy overhead, and other ancillary and related services. The dispensing fee does not include the cost of the drug product, corporate overhead, or profit (*see* Supp. Pharmacy A Aff. ¶ 6f). Federal law requires that the dispensing fee paid to pharmacies be reasonable (*Id.*, ¶ 39) (*citing* 42 C.F.R. § 447.331(b)(1)).

10. The Medicaid Pharmacies participate in the Medicaid Program pursuant to provider agreements executed with the IDPA (a sample may be found at Ex. B to the Amended Complaint). That form seems to be applicable to any provider that participates in the Medicaid Program; it is not tailored specifically to pharmacies. The form agreement provides that the provider "shall receive payment based on the Department's reimbursement rate which shall constitute payment in full" (Am. Compl., Ex. B, ¶ 6). Thus, although it does not say this explicitly, the form agreement provides for reimbursement for the drugs and related services that plaintiffs provide (Am. Compl. ¶ 42). And, a fair reading of the agreement is that it provides – as it must – that the payments will be in accordance with the requirements of the Medicaid Act (*see* Am. Compl., Ex. B, ¶ 1) (stating that certain notice is required for changes in policy except if, among other things, the changes are "to comply with . . . Federal law or regulation").

7

11. The form provider agreements between IDPA and the Medicaid Pharmacies do not provide for an expiration date, or set forth the manner by which the agreements may be terminated. But, at oral argument the IDPA stated – without contradiction by plaintiffs – that those provider agreements are terminable by a provider at will as of the end of a given calendar month, on advance notice by the provider (no details were given as to the amount of advance notice necessary). In addition, although not disclosed in the written evidentiary submissions, at oral argument the plaintiffs stated – without contradiction by defendant – that they have separate provider agreements with the nursing homes and other facilities, which cover their services to both Medicaid and non-Medicaid patients. The plaintiffs have not provided copies of those agreements, or any evidence concerning the procedures for terminating them, or the notice required for termination.

**C.    The IDPA Budget Appropriations For Medicaid Expenses.**

12. For Fiscal Year ("FY") 1999, the IDPA's appropriation budget for Medicaid prescription drugs was $668,412,900, and the actual Medicaid expenditures for these drugs was $678,224,794. For FY 2000, the IDPA's appropriation budget for prescription drugs was $757,689,400, and (at the time the amended complaint was filed) "the estimated Medicaid expenditures for prescription drugs [was] $784,655,800" (Am. Compl. ¶ 47). For FY 2001, the appropriation budget for prescription drugs is $958,780,300 (*Id.*, ¶ 48).

13. Drug manufacturers negotiate with the State of Illinois and pay directly to the state money rebates for drugs dispensed through the Medicaid Program. One half of the rebate amount goes to the State of Illinois and the other half goes to the federal government (Am. Compl.

¶ 53). During the past five years, the amount of rebate dollars has increased significantly from approximately $85 million for FY 1996-1997, to approximately $182 million for FY 2000-2001, or $91 million for Illinois and $91 million for the federal government (*Id.*). Thus, Illinois' estimated share of rebates in FY 2001 will be approximately $91 million (*Id.*, ¶ 48).

14. Illinois' rebates are deposited into the general revenue fund, and are not credited to the IDPA's budget (Am. Compl. ¶ 54). That is also the procedure followed in 19 other states (*Id.*, Ex. F). In contrast, 13 states credit their portion of the rebates directly into their Medicaid Drug Budgets, with the remaining 17 states crediting these rebates to other more general Medicaid budgets (*Id.*).[4]

**D.     Rising Costs of Pharmaceuticals and Related Services.**

15. Prior to December 15, 2000, IDPA reimbursed plaintiffs for the drugs and related services provided to Medicaid recipients under the following formulas:

(a)     **Brand Name Prescription Drug Reimbursement**: Brand name prescription drugs are those with no available generic equivalent (Supp. Pharmacy A Aff. ¶ 11a). Medicaid Pharmacies received an amount equal to the lesser of (1) average wholesale price ("AWP") for drugs where that price is based on actual market wholesale price plus the established dispensing fee, or (2) AWP less 10 percent for each prescription

---

[4]Plaintiffs imply that all states other than Illinois with large Medicaid populations allocate these rebates to Medicaid budgets (*Id.*, ¶¶ 54-55). But plaintiffs offer no evidence as to the size of Medicaid populations in various states. Judging by the size of rebates, however, states such as Florida and Massachusetts have large Medicaid populations – and, like Illinois, allocate the rebate funds to their general budgets (Am. Compl., Ex. F).

dispensed, plus the established dispensing fee (Pls.' Ex. J).[5] If the cost of the brand name prescription drug was at or less than $34.50, the dispensing fee would be $3.45 per prescription; if the cost was greater than $34.50, the dispensing fee increased up to a maximum of $15.40 for each prescription dispensed (Am. Compl. ¶ 58). As of the time of the recent change to the formula, this methodology resulted in reimbursement based on the AWP less 10 percent formula.

(b)    **Generic Prescription Drug Reimbursement**:  Generic drugs are chemically equivalent to brand name drugs, and are available from more than one manufacturer (Supp. Pharmacy A Aff. ¶ 13a).  The Medicaid Pharmacies were reimbursed for generic prescription drugs at an amount equal to the lowest of:  (1) the pharmacy's prevailing charge to the general public; (2) AWP less 12 percent, plus the established dispensing fee; (3) the AWP where that price is based on actual market wholesale price, plus the established dispensing fee; (4) the maximum allowable cost ("MAC"); or (5) the federal upper limit ("FUL") mandated by HCFA (Pls.' Ex. J).  The established dispensing fee was $3.75 for drugs with a cost of $37.50 or less; if the cost of the generic prescription drug was greater than $37.50, the dispensing fee would increase up to a maximum of $15.70 (Am. Compl. ¶ 59).  As of the time of the recent change to the formula, this methodology resulted in reimbursement being based on the AWP less 12 percent formula.

---

[5]"Average wholesale price" is determined by reference to the manufacturer's list price (Supp. Pharmacy A Aff. ¶ 10b).

(c) **OTC Reimbursement**: The Medicaid Pharmacies were reimbursed for OTC drugs at the lower of (1) the prevailing charge to the public, or (2) the wholesale acquisition cost ("WAC") plus a percentage established by the IDPA – which at the time was 50 percent (Pls. Ex. J).[6] *See also* 89 Ill. Adm. Code 140.446. As of the time of the recent change to the formula, this methodology resulted in reimbursement being based on the WAC plus 50 percent formula. We note that plaintiffs assert that the pre-December 15, 2000 formula for OTC reimbursement was based on AWP, not WAC (Supp. Pharmacy A Aff. ¶ 15a). But that assertion conflicts with the documentary evidence supplied by plaintiffs: a redlined version of the OTC reimbursement formula, showing how it was altered as of December 15, 2000 (Pls.' Ex. J). In the face of this discrepancy, we rely on the documents rather than plaintiffs' interpretation of them.

16. During the past five years, the drug product component cost of the average Medicaid prescription filled in Illinois has increased by approximately 20 percent per year (before taking into account drug manufacturer rebates), for a five-year increase of nearly 100 percent. This increase is due to price increases charged by drug manufacturers, as well as to the introduction and adoption by Illinois physicians of new, more therapeutically effective, and more expensive drugs (Am. Compl. ¶ 43). Not only have the cost of drug products increased, but the number of prescriptions filled in Illinois for Medicaid recipients has also

---

[6]"The wholesale acquisition cost" is the amount that wholesalers pay to manufacturers for drugs and, according to plaintiffs, always is less than the average wholesale price, which is list price (Supp. Pharmacy A Aff. ¶ 10c-d).

increased; and with those prescriptions, the dispensing fees associated with them have increased as well (*Id.*, ¶ 44).

17.    By June 2000, the IDPA knew that it would experience a budgetary shortfall for Medicaid prescription drugs, and revised its budget for FY 2001 from an initial budget of $958,780,300 to approximately $1,015,000,000. IDPA's budget calculations did not include provisions for any rebates from drug manufacturers (Am. Compl. ¶ 50).

18.    On November 21, 2000, Director Patla announced that money was needed within the next six months to address the IDPA's anticipated financial shortfall for FY 2001 (Am. Compl. ¶ 51). On November 30, 2000, the State of Illinois announced "that a dramatic upsurge in Medicaid costs would require tens of millions of dollars of cutbacks in payments to hospitals and pharmacies" (*Id.*, ¶ 52). Specifically, the State announced that it was proposing to cut $50 to 60 million in payments to Medicaid pharmacists and pharmacies over an 18-month period ending on June 30, 2002 (*Id.*, ¶ 52).

**E.    The Reimbursement Methodology in Illinois.**

19.    According to plaintiffs, prior to December 15, 2000, the reimbursement formula set forth in paragraph 15 above had been in effect – in essentially that form – for some 10 years (Am. Compl. at 4 (Nature of the Case)).[7]    As of December 15, 2000, IDPA altered the reimbursement formula. In the course of doing so, IDPA issued three Legal Notices

---

[7]That assertion somewhat overstates the historical record. In 1995, in conjunction with the 1996 Budget Plan, the IDPA changed the method for calculating the maximum reimbursement amount for brand name and generic prescription drugs. *See* 19 Ill. Reg. 16677 (or 89 Ill. Adm. Code 140). For brand name drugs, the IDPA reduced the *dispensing fee* component of the maximum reimbursement amount by 28 cents per prescription. For generic drugs, the *acquisition cost* component was established as the lower of the average wholesale price minus 12 percent or the FUL or the SUL. For over-the-counter medicines, the IDPA paid the lower of the prevailing charge to the general public or the *wholesale acquisition cost* "plus the percentage established by the Department for over-the-counter items." *Id.*

soliciting public comment (*Id.* ¶ 77 and Ex. G). Those three notices are undated, but according to plaintiffs, they were issued on November 21, December 7 and December 11, 2000 (*Id.*).[8]

20. The November 21 notice proposed changes in the methodology for reimbursement for brand name, generic, and OTC drugs. That notice proposed (a) to add as an alternative reimbursement approach for brand name drugs WAC plus 8 percent, and a flat dispensing fee of $3.00 per prescription; (b) to add as an alternative reimbursement approach for generic drugs WAC plus 12 percent, and a flat dispensing fee of $3.58; and (c) to add as an alternative reimbursement approach for OTC drugs AWP plus up to 25 percent. The notice stated that these changes were expected to decrease annual Medicaid expenditures by approximately $65 million, and were planned to go into effect for services provided after December 11, 2000. Neither party has offered any evidence concerning what discussions, if any, IDPA representatives had with the pharmacies providing Medicaid services prior to issuing the first notice, or what investigation the IDPA did, if any, prior to proposing the revisions set forth in that notice.

21. The December 7 notice set forth the same proposed revision to the reimbursement for OTC, but changed the proposed reimbursement approach for brand name and generic drugs by increasing the flat dispensing fee to $4.17 for each type of drug. The notice stated that with this change, the new reimbursement formulas would go into effect for services provided on or after December 15, 2000, and that the new reimbursement formulas would decrease

---

[8] Although not clearly identified, it appears that the November 21 notice is the second document in Exhibit G; the December 7 notice is the third document; and the December 11 notice is the first document.

annual Medicaid expenditures by some $52 million. The notice stated that the changes were made "as a result of the comments received" in response to the November 21 notice – but no evidence has been offered as to what comments were made, or by whom.

22.     The December 11 notice repeated, in substance, the reimbursement formulas as set forth in the December 7 notice for brand name, generic, and OTC drugs. The notice again stated (without elaboration) that the changes took account of comments to the November 21 notice by "interested parties." Moreover, this notice projected the annual savings in Medicaid expenditures to be $70 million – no explanation is offered in the notice (or in defendant's briefing) as to why the estimated savings were changed from $52 million in the December 7 notice to $70 million in the December 11 notice, even though the notices set forth the same revised reimbursement formulas.

23.     The December 11 notice stated that the revised reimbursement formulas would become effective on December 15, 2000 (which is what occurred).[9] The notice nonetheless invited further public comment on the revised formulas, to be submitted by December 26, 2000. The Court has not been provided with evidence of what further public comment, if any, has been received in response to this notice.[10]

---

[9]The new reimbursement formula thus became effective less than 30 days from the publication of notice, whichever notice is used as the measuring stick. However, since the new formula was promulgated as an "emergency rule," under the language of the provider agreements the 30-day written notice was not required (Pls.' Ex. B, ¶ 1). Having dismissed the supplemental state law claims, we express no view as to whether the IDPA was properly acting in response to an "emergency," or whether plaintiffs have any viable state law claims resulting from the manner in which the IDPA promulgated the revised reimbursement formula.

[10]In a meeting on January 9, 2001, the JCAR voted to suspend the December 15, 2000 emergency rule making by the IDPA "because it may result in diminished access to Medicaid pharmaceutical services in Illinois, thus threatening the safety and welfare of medical assistance clients." *See* Pls.' JCAR Exhibit 3. JCAR overturned its ruling 24 hours later. *Id.,* Ex. 2. Based on the JCAR transcript submitted by plaintiffs, it appears that the suspension was based on a misunderstanding (Ex. 2), and the reinstatement of the emergency rule was intended to remedy that mistake (*Id.*). In their reply brief, the plaintiffs mention the JCAR actions, but do not argue that the JCAR suspension or reinstatement

24.     The following table illustrates the practical difference between the old rule and the new rule:[11]

| | | Old Rule | New Rule |
|---|---|---|---|
| **Brand** | 25.<br>2. | AWP - 10% + $3.45 dispensing fee<br>If drug cost higher than $34.51, then the dispensing fee increased to maximum of $15.40 per prescription ("sliding scale") | WAC + 8% + $4.17 dispensing fee |
| **Generic** | 1.<br>2. | AWP - 12% + $3.75 dispensing fee.<br>If drug cost higher than $37.51, then the dispensing fee increased to max. of $15.70 0per prescription. | WAC + 12% + $4.17 dispensing fee. |
| **OTC** | | WAC + (up to) 50% | AWP + 25% |

*See* Pharmacy A Aff. ¶¶ 10, 11; Supp. Pharmacy A Aff. ¶¶ 9, 11-15; *see also* Pls.'s Ex. J).

25.     Plaintiffs state that, under these new formulas, they will receive less money for providing both brand name and generic drugs. According to plaintiffs, those changes will result in reimbursement for brand name and generic drugs being based on WAC rather than AWP as the basis for drug product component cost reimbursement; only three other states use WAC in this way (Am. Compl. ¶ 75).

---

has any particular legal significance in light of their burden under *Methodist Hospitals*, nor does the Court find any.

[11]There are other alternative formulas for reimbursement that carried over from the old to the revised rule. However, since those alternative formulas would result in higher reimbursement rates, as a practical matter, the parties (and the Court) focus on the formulas that result in the lowest reimbursement available, under the old rule and as changed in the new rule.

26. Plaintiffs state that the new reimbursement formula for the drug component of brand name drugs (WAC + 8 percent) is equivalent to average wholesale price less 10-13.6 percent (depending on the drug); since the old formula was average wholesale price less 10 percent, this results in a somewhat lower level of reimbursement for some brand name drugs (Supp. Pharmacy A Aff. ¶ 12). Plaintiffs say that the decrease is more pronounced with respect to the cost component of generic drugs. The new formula (WAC + 12 percent) is equivalent to the average wholesale price less 32.8 percent, which is a more substantial decrease from the cost component calculation for generic drugs under the old formula (AWP - 12 percent) (*Id.* at ¶ 14). Pharmacy A further suggests that this decrease is particularly magnified because over the past decade the use of generic drugs has increased, such that about 60 percent of all prescriptions for residents of nursing homes and CILAs are filled with generic drugs (*Id.* at ¶ 13b).

27. Plaintiffs state that in addition to providing for diminished reimbursement for the drug cost component, the new formula cuts into reimbursement for the dispensing fee. According to Pharmacy A, the average dispensing fee it received under the sliding scale provided in the previous formula was $5.72. Thus, the new flat rate dispensing fee of $4.17 results in an average decrease in the dispensing fee of $1.55 per prescription, a 27 percent reduction (Supp. Pharmacy A Aff. ¶¶ 9a-b). No similar data has been supplied by the other plaintiffs concerning the effect of the change in the dispensing fee.[12]

---

[12]Pharmacy A also says that the reimbursement for OTC drugs has been reduced by 16.7%; this would result in an annual decrease in reimbursement for OTC drugs of about $1.17 million (Supp. Pharmacy A Aff. ¶¶ 15a-c). But that calculation is based on the premise that the formula for OTC drug reimbursement was changed from *AWP* plus 50% to *AWP* plus 25% (*Id.*). However, the redlined version of the emergency rule cited by plaintiffs (Pls.' Ex. J) shows that this premise is incorrect, and that the change was from *WAC* plus 50% to *AWP* plus 25%. Plaintiffs state that "WAC

**F.      The Predicted Impact of the New Rule on Medicaid Pharmacies and Recipients.**

28.      The impact of the IDPA's emergency rule on the Medicaid Pharmacies' income and their ability to continue to serve Medicaid recipients residing in Illinois nursing homes and CILAs is not certain, and the affidavits submitted by the plaintiffs do not make it more certain. Plaintiffs offer their own affidavits, as well as those from several healthcare professionals and Medicaid recipients, in which the affiants uniformly assert that reductions in the announced reimbursement rates will make continued service at current levels to Medicaid recipients in certain nursing homes and CILAs impossible (*see, e.g,* Index to Exhibits, Affs. A, D, K-X; Bedient Aff.; Supp. Pharmacy A Aff., and Affs. of Durkin, and Pharmacies A, B, and D). The affidavits predict a scenario that would be troubling – if it truly came to pass. But at the present, plaintiffs' predictions are just that; the Medicaid Pharmacies have offered no evidence that any closures or reductions in service have occurred or are imminent. Plaintiffs' predictions may prove correct. But the evidence submitted by the plaintiffs does not clearly show that the new reimbursement formula likely will necessitate substantial cutbacks in services to Medicaid recipients, or will fail to attract new pharmaceutical players to the table to provide services at the rates established by the new rule to compensate for any current providers who might reduce services or leave the program altogether.

29.      Moreover, the affidavits do not offer any concrete comparison of the overall level of services available to both the Medicaid and the non-Medicaid populations in certain geographic areas: under either the old formulas or the new ones. And, the Court further finds that the

---

is always less than AWP" (Supp. Pharmacy A Aff. ¶ 10d), and thus it may be the case that, as changed, the new rule provides for no significant decrease in OTC drug compensation. In any event, plaintiffs offer no calculation based on a comparison of WAC plus 50% (the old formula) to AWP plus 25% (the new formula).

plaintiffs' affidavits do not show that the state would fail to provide relief if the new reimbursement rates prove insufficient to maintain or attract sufficient providers of services to Medicaid recipients.

30. We begin by discussing the plaintiffs' evidence concerning the economic affect they say the new reimbursement formulas will have on the profitability of their Medicaid business, which is summarized in the chart set forth below:

| | Pre 12/15 Net Income Attributable to Medicaid | | Post 12/15 Net Income Attributable to Medicaid | | Reduction in Medicaid Net Income Due to Change |
|---|---|---|---|---|---|
| | Profit | Loss | Profit | Loss | |
| **Pharmacy A** | 1.6% | | | (-3.4%) | (-5.00%) |
| **Pharmacy E** | ? | ? | | | |
| **Pharmacy C** | ? | ? | ? | ? | (-2.25%) |
| **Pharmacy B** | 7.12% | | 1.01% | | (-6.00%) |
| **Pharmacy D** | ? | ? | ? | ? | ? |

31. Accepting at face value the numbers provided by Pharmacies A, B and C (although the numbers are likely somewhat overstated, at least for Pharmacy A, due to the plaintiffs' erroneous assertion about how the OTC reimbursement formula was changed), they suggest precisely what one might expect: that each of those plaintiffs operates its business differently, each has a different cost structure, and each is therefore affected differently by the new formulas. The figures show that Pharmacy A will have a five percent reduction in net income,

18

changing the net income from a positive 1.6 percent under the old formulas to a negative net income figure of 3.4 percent for Medicaid business under the new formulas, assuming the same level of Medicaid services continue to be provided (Pharmacy A Aff. ¶¶ 9-11). But for Pharmacy B, the pre-December 15 net income margin attributable to Medicaid was greater (7.12 percent), so that even with the reductions under the new formula Pharmacy B would continue to show a small positive margin on the Medicaid business (1.01 percent) – without any service cutbacks (Pharmacy B Aff. ¶¶ 11-12, 17, 19). And as for Pharmacy C, there is a smaller reduction in net Medicaid income – 2.25 percent – than for Pharmacy A or Pharmacy B (Pharmacy C Aff. ¶ 14). We have been given no information at all concerning the pre-December 15 Medicaid net income (or loss) from several plaintiffs, thus making it impossible to determine how they might be affected by the new formulas.

32.     The Court has received even less information on the overall net income of plaintiffs' operations under the pre- and post- December 15, 2000 formulas, combining both Medicaid and non-Medicaid business. That information is summarized in the chart below:

| | Pre 12/15 Total Net Income Margin (All Sources) | | Post 12/15 Total Net Income Margin (All Sources) | | Change in Total Net Income Margin Due to Change |
|---|---|---|---|---|---|
| | Profit | Loss | Profit | Loss | |
| **Pharmacy A** | ? | ? | ? | ? | ? |
| **Pharmacy E** | ? | unspecified amount | ? | unspecified amount | (unspecified negative amount) |
| **Pharmacy C** | .21% | | | | (-1.56%) |

| Pharmacy B | ? | ? | ? | ? | |
|---|---|---|---|---|---|
| | | | | | ? |
| Pharmacy D | ? | ? | ? | ? | ? |

33.     The Court finds this absence of information relevant in assessing plaintiffs' assertions that under the new rates they will dramatically reduce the level of services – or, in the case of Pharmacy E, which is not a named plaintiff, will withdraw from the Medicaid business entirely (Pharmacy E Aff. ¶ 6). In the case of Pharmacy E, the information shows that even under the old formulas (which plaintiffs do not challenge) that company was losing money (Pharmacy E Aff. ¶ 5). Accepting the statement of plaintiffs' economist that a rational business would not continue to stay in business at a loss (Durkin Aff. ¶ 9), Pharmacy E likely would not remain a Medicaid provider for long – under either the pre-or post-December 15, 2000 reimbursement formulas. In the case of Pharmacy C, the evidence is that a small (.21 percent) but positive net income based on Medicaid and non-Medicaid business would turn into a small (1.56 percent) overall net loss due to reimbursement cuts based on the new formulas (Pharmacy C Aff. ¶¶ 13,15). But Pharmacy C has not adequately explained why dramatic service cuts would be required to account for this differential.[13] And as to Pharmacies A, B, and D, we are provided

---

[13]Pharmacy C projects a decrease in revenue of $8,576.00 per month, or $102,912.00 annually (Pharmacy C Aff. ¶ 17). Pharmacy C says that this will lead to a reduction in force of 19 employees, a decrease in hours of operation, and a curtailment of delivery services (*Id.*, at ¶ 5) – which, in the absence of any explanation, appears on its face an excessive response to the magnitude of loss projected. The Court considers this point in assessing the credibility of the predictions concerning the level of cutbacks that would be needed – or made.

with no information as to the overall net income derived from their operations, either before or after the change in the formulas.[14]

34.    The Court finds that the overall net income figure is important because all of these plaintiffs – to varying degrees – serve both Medicaid and non-Medicaid patients (*see* Finding No. 3, above). Certainly, many Medicaid patients live in nursing homes and CILAs side by side with Medicaid recipients.  Plaintiffs have offered no evidence that the nursing homes and CILAs with which they have separate provider contracts would allow plaintiffs to serve only the non-Medicaid patients, or to provide Medicaid patients with a lesser level of service than is afforded to non-Medicaid patients.  Thus, as a practical matter, in order to reduce or eliminate services to Medicaid patients, plaintiffs may have to withdraw from providing those services altogether: which they may not be inclined to do if, viewed from an overall perspective, they are making a profit with which they can live.  Plaintiffs' failure to provide information concerning overall profitability is thus a significant gap in their evidentiary presentation.

35.    There are two other shortcomings in plaintiffs' evidence that bear mention. *First*, not only have plaintiffs failed to offer any information about the economic situation or intentions of Pharmacy D (which serve about 4000 of the 51,000 recipients served by plaintiffs),[15] but they also failed to offer any evidence concerning the economic situation or intentions of the providers who serve

---

[14]Plaintiffs have asked the Court to consider media reports on March 29, 2001, that Walgreens had decided to eliminate evening and Sunday prescription services at 30 of its 409 stores in Illinois.  The news reports quote Walgreens officials as citing the new reimbursement formulas as the reason for these cutbacks.  However, a few days later, the media reported that Walgreens had decided to defer any reduction in services pending discussions with the state.  Thus, even setting aside the perils of relying on news reports for evidence, we are unwilling to put much weight on reports concerning Walgreens actions.

[15]This claculation is based on the assertions in the affidavits from Pharmacies A, B and C.

the Medicaid nursing home and CILA population that is not served by the plaintiffs. Since plaintiffs challenge the reimbursement formula on a state-wide basis, all pharmacies providing the "geographic area" of the entire state must be considered. Taken together, Pharmacy D and these other unnamed providers service as much as about 28 percent of the Medicaid population in nursing homes and CILAs.[16] The Court has been provided with no information concerning whether these other providers would increase their levels of service if any of the Medicaid Pharmacies here decreased their service. Thus, plaintiffs have provided an incomplete picture from which to draw the conclusion that there will be a significant reduction in services to Medicaid patients.

36.    *Second*, plaintiffs have entirely omitted any discussion of the existing level of pharmaceutical services received by non-Medicaid recipients in nursing homes and CILAs. Nor have plaintiffs offered any evidence to show how they would be able to reduce the services to Medicaid recipients without also reducing services to the non-Medicaid patients residing in the same facilities. There is also no evidence regarding how the recipients' access compares to the non-Medicaid population in the same geographic area. Because the plaintiffs focus on state-wide boundaries, rather than smaller geographic areas, the Court cannot determine whether discrete groups of recipients will suffer access problems based on the, as yet, hypothetical predictions that services will be cut back or eliminated. Therefore, plaintiffs have failed to show that even

---

[16]If the total Medicaid population is, for example, 65,000 residents, then by the plaintiffs' own admission, they do not serve 14,000 Medicaid recipients (65,000-51,000 = 14,000) (Supp. Pharmacy A Aff. ¶ 19). These 14,000 recipients who are not served by plaintiffs, plus the approximately 4,000 Medicaid recipients represented by Pharmacy D equals approximately 18,000 Medicaid recipients for whom we have no information. Eighteen thousand is approximately 28 percent of the 65,000 total Medicaid recipients in Illinois. The Court finds this to be a significant percentage of the whole.

if there are some reductions in service to Medicaid recipients, that this will result in Medicaid recipients receiving less access to service than do non-Medicaid patients.[17]

37.     These shortcomings in plaintiffs' evidence are not overcome by the affidavit of their economist, John T. Durkin. Mr. Durkin's affidavit is based on an uncritical and untested acceptance of the assertions in plaintiffs' affidavits concerning their cost and profit structures. Mr. Durkin relied solely on those affidavits (Durkin Aff. ¶ 5), without doing any independent investigation of any of the plaintiffs' operations. He thus does not consider whether there may be inefficiencies in plaintiffs' operations that, if corrected, would allow them to deliver services profitably under the new reimbursement formula. We hasten to add that we do not know that this is the case; but we will not fill in the gaps in plaintiffs' evidence by assuming that it is not.

38.     Even setting aside this problem, Mr. Durkin's opinions are not adequately supported by the affidavits on which he relies. Mr. Durkin has opined that the plaintiffs "all have approximately

---

[17]The plaintiffs have submitted the affidavits of five nursing home residents (Exs. L, M, and W); four nurses (Exs. N, S, and X); and ten nursing home administrators and/or directors (Exs., N, O, P, Q, R, U and Bedient Aff.). These affidavits, like the affidavits from the plaintiff providers, make various predictions about the potential effect of service cutbacks and/or elimination of services. As for the residents, they each state that any elimination or reduction in services will adversely affect their health. The nurses make the same predictions, and further predict that the state will ultimately pay higher costs to provide necessary services to patients that the plaintiff pharmacies may no longer provide. The nursing home administrators sound the same chord. We do not question the sincerity of the concerns expressed in those affidavits; but, none of those affidavits make the predicted service cuts or elimination more likely.

Nor do those affidavits provide further clarity on the relationship between the agreements nursing homes and providers have with respect to the Medicaid population and the agreements the homes and providers have with respect to the non-Medicaid, private-pay populations residing in those homes. For example, the affidavits do not tell the Court whether the termination of agreements between providers and nursing homes with respect to the Medicaid population will also terminate services to the private pay population residing in those homes. Although the plaintiffs argue that these affidavits "establish the direct harm caused to Medicaid recipients in the form of inefficient, uneconomical, and lower quality of care imposing unequal access to care, all resulting from the cutbacks in related services" (Pls.' Reply Mem. 3), none of the affidavits listed here mention unequal access as an issue. Rather, it is the providers who predict unequal access between private pay and Medicaid recipients as a result of service cuts. But, without evidence that such lines will actually be drawn between services to Medicaid and non-Medicaid recipients, the Court cannot draw that conclusion.

the same cost structure," and this means that if one pharmacy is not "making well above normal profits" then the other pharmacies are not either ( Durkin Aff. ¶ 14). But the Court's review of those same affidavits does not lead us to the same conclusion. Instead, the plaintiffs' cost structures prior to the rate change (to the extent we have evidence of them) appear to be different, as revealed by the net income figures provided by Pharmacies A and B (*see* Finding Nos. 30-33, above).

39.    Mr. Durkin has also opined that "because of the now greater disparity between private pay revenues and Medicaid revenues, Medicaid recipients will get less service, care and quality of care than nursing home, CILA and assisted living residents, whose care and services are paid for from non-Medicaid sources" (Durkin Aff. ¶ 16). Mr. Durkin further states that "will lead to a clear and blatant denial of equal access to Medicaid recipients" (*Id.*). Again, there is no corroborating evidence in the record regarding Mr. Durkin's economic conclusions, and his opinion is essentially predictive; it does not represent an assessment of the current marketplace.

## II.

Federal Rule of Civil Procedure 65 establishes the procedure for securing preliminary injunctive relief in civil actions. The purpose of a preliminary injunction is to preserve the status quo between parties pending a   final determination of the merits. In the Seventh Circuit, "a party seeking a preliminary injunction must demonstrate: (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (*citing Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386-87 (7th Cir. 1984)). "If the moving party cannot establish either of these prerequisites, a

court's inquiry is over and the injunction must be denied," without considering the balance of hardships or the public interest. *Abbott Labs*, 971 F.2d at 11.

Plaintiffs here seek to preliminarily enjoin the state from applying the new reimbursement formulas for brand name, generic and OTC drugs on the ground that those formulas violate the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), by depriving plaintiffs of their right to reasonable reimbursement, and by depriving Medicaid recipients of access to services at a level and a quality commensurate to that received by non-Medicaid recipients in Illinois. Section 1396a(a)(30)(A) (hereinafter, "Section 30(A)") states that every Medicaid plan:

> must provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

After consideration of the stipulated evidence in the record, the Court finds that plaintiffs have failed to establish entitlement to a preliminary injunction because, under the law of this Circuit as established in *Methodist Hospitals Inc. v. Sullivan*, 91 F.3d 1026 (7th Cir. 1996), they cannot establish some likelihood of succeeding on the merits of this claim (at least not yet). Because *Methodist Hospital* is dispositive of plaintiffs' motion, we begin with a discussion of that decision. We then turn to an analysis of how *Methodist Hospital* applies to this case in its present posture.

### III.

In *Methodist Hospital*, the Seventh Circuit considered a challenge to Indiana's formula for reimbursing providers for the delivery of Medicaid services. On January 1, 1994, Indiana had reduced the price it offered for inpatient and outpatient medical services, using statewide averages of going

25

prices as benchmarks. 91 F.3d at 1030. The state then conducted studies to determine whether the new prices elicited enough medical care, and based on these post-rate change studies, in October and November 1994 Indiana implemented a revised reimbursement system for physicians' services and for inpatient hospital services – but left the payment scheme for outpatient services unchanged. *Id.* There was no evidence that any provider withdrew from the Medicaid program as a result of any of the revised reimbursement formulas. *Id.*

The Seventh Circuit began by plainly holding that providers of medical care have a private right of action under Section 30(A). *Id.* at 1029. The Seventh Circuit first rejected the argument that the term "geographic area" used in Section 30(A) is "so ambulatory that the Section does not create a private right of action." *Id.* The appeals court then found that while the appropriate geographic area to be used in determining equal access under Section 30(A) might vary based on the type of medical service provided, that variability did not render the statute unenforceable: "[d]efining geographic markets for medical care has proven no more tractable than geographic markets in general, but courts soldier on." *Id.*

The Seventh Circuit then considered whether providers could enforce the requirements of Section 30(A), through an action under 42 U.S.C. § 1983. The appeals court observed that in *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), the Supreme Court held that hospitals have a private right of action to enforce another section of the Medicaid Act – the Boren Amendment, 42 U.S.C. § 1396(a)(13)(A) (hereinafter, "Section 13(A)") – which, like Section 30(A), contains an "equal access provision." 91 F.3d at 1029. The appeals court explained that *Wilder*, while later distinguished by the Supreme Court in *Suter v. Artist M.*, 503 U.S. 347 (1992), had not been overruled, and that

"*Wilder's* holding binds us." *Id.* Thus, the Seventh Circuit held that "providers of medical care have a private right of action, derived through § 1983, to enforce § 1396a(a)(30)." *Id.*

However, the balance of the opinion makes clear that a provider may not prove a Section 30(A) violation merely by criticizing a state's procedure in implementing a revised rate, or by predicting a diminished level of access and quality of care. The Seventh Circuit made clear that a claim under Section 30(A) will stand or fall based on proof of the actual results of a reimbursement plan.

The Seventh Circuit rejected plaintiffs' criticisms concerning Indiana's purported lack of "comprehensive studies" prior to enacting the January 1994 changes in reimbursement. The appeals court flatly stated that "[n]othing in the language of § 1396a(a)(30), or any implementing regulation, requires a state to conduct studies in advance of every modification." 91 F.3d at 1030. In so ruling, the Court distinguished Section 13(A), which required states to "make[] assurances" to the federal government that their reimbursement plans would satisfy the statutory objectives and thus necessitate pre-implementation studies, from Section 30(A), which requires no similar "assurances." *Id.*

Moreover, the Court expressed substantial skepticism over the value of any information such studies might obtain:

> it is exceptionally difficult to determine demand and supply schedules for a single product. Doing this for the entire medical segment of the economy would be more than difficult; it would be impossible. A state could send out a survey, but questions such as "Tell us the minimum amount you would accept without withdrawing from the market" would not elicit honest answers. People often do not even *know* their reservation prices; they do not willingly reveal them.

*Id.* (emphasis in original). Thus, the Seventh Circuit rejected plaintiffs' procedural challenge, holding that Section 30(A) "requires each state to produce a *result*, not to employ any particular methodology for getting there." *Id.* (emphasis original).

As might be expected from this analysis, the Seventh Circuit rejected plaintiffs' attempt to enjoin the reimbursement formula based on predictions of adverse consequences. Having commented on the doubtful value of pre-implementation statements by providers as to their true "reservation prices," the appeals court held that under Section 30(A):

> states may behave like other buyers of goods and services in the marketplace: they may say what they are willing to pay and see whether this brings forth an adequate supply. If not, the state may (and under § 1396a(a)(30), must) raise the price until the market clears.

91 F.3d at 1030. The court held that this is precisely what Indiana had done. The Seventh Circuit explained that after implementing the new reimbursement formulas in January 1994, the state "launched studies to find out whether the new prices elicited enough medical care." *Id*. The court rejected the assertion that these studies were meaningless "after-the-fact paperwork," noting that the studies resulted in further versions to the reimbursement rates for physician and inpatient services – the January 1994 rates for outpatient services remained unchanged. The Seventh Circuit then observed that plaintiffs had offered no evidence that they "ha[d] withdrawn from the outpatient market as a result . . . [or] that *any* provider withdrew, anywhere in the state." *Id*. (emphasis in original).

The Seventh Circuit made clear that it was these actual results that controlled:

> Plaintiffs offered dire predictions, but Indiana used 1994 to check predictions against reality. This approach seems to us sound. Whether or not a better way could be devised, it was a lawful way to proceed.

*Id*. Thus, the court rejected plaintiffs' attempt to enjoin application of the Indiana reimbursement rule.

## IV.

The parties in this case have regarded *Methodist Hospital* as they might a flowering cactus: they see some beauty in it, but are unwilling to embrace its entirety. Plaintiffs enthusiastically endorse the Seventh Circuit's recognition of a private right of action for providers under Section 30(A), but are unwilling to confront the limitations the appeals court placed on that right. For its part, defendant cannot bring itself to admit that *Methodist Hospital* recognized a private right of action for providers, but enthusiastically endorses the appeals court's analysis of what a provider must prove to establish a violation of Section 30(A).

While an advocate may feel at liberty to pick and choose those portions of an appellate decision it may like, and attempt to disregard the rest, this Court is not free to do so here, where the appellate decision constitutes the controlling law in this Circuit. Thus, the Court here applies *Methodist Hospital* as a whole – thorns (as they may be perceived by each side) and all. And under *Methodist Hospital*, the plaintiffs here have a right of action to assert that the IDPA's current reimbursement formula for brand name, generic and OTC drugs violates Section 30(A) – but have failed to establish a likelihood of prevailing on that claim sufficient to support a preliminary injunction.

### A.

We begin with plaintiff's right to maintain this action, which the Seventh Circuit scarcely could have stated in more explicit language: "[w]e therefore follow *Arkansas Medical Society* and hold that providers of medical care have a private right of action, derived through § 1983, to enforce § 1396a(a)(30)." *Methodist Hospital*, 91 F.3d at 1029. While never quoting or addressing this language, defendant nonetheless argues that plaintiffs here have no private right of action (Def.'s Mem. at 6). In

substance, this argument boils down to the assertion that in light of several developments in the law after the *Methodist Hospital* decision, the Seventh Circuit no longer would recognize a private right of action for providers under Section 30(A).

*First*, defendant notes that in 1997, the Boren Amendment was repealed, thus eliminating private rights of action by providers to contest reimbursement rates under Section 13(A). *Second*, defendant cites to *Blessing v. Freestone*, 520 U.S. 329 (1997), in which the Supreme Court held that Section 1983 provides redress for violations of a federal statute only by a plaintiff that alleges a violation of *its* federal right, and not merely for a general violation of federal law. *Third*, defendant points to *Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908 (5th Cir. 2000), in which the Fifth Circuit relied on these developments in the law in refusing to recognize a private right of action for providers under Section 30(A).

The defendant is correct that none of these authorities was before the Seventh Circuit when it decided the *Methodist Hospitals* case. However, while the *Evergreen* analysis is not without force, it is by no means certain that these authorities would persuade the Seventh Circuit to abandon its view of a private right of action for providers.

The Fifth Circuit may be correct that denying a private right of action to providers under Section 30(A) is "consistent with Congress's concern in its repeal of the Boren Amendment to preclude further lawsuits by providers to contest the adequacy of their reimbursement rates." *Evergreen*, 235 F.3d at 929 n. 26. But it also is true that "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114 (1989). The fact that the right of action under Section 13(A) was repealed does not inevitably lead to the conclusion

that Congress intended to eliminate that right in actions under Section 30(A) – indeed, one might argue that this was not Congress' intent here, since Congress is presumed to have known in 1997 that cases like *Methodist Hospitals* and *Arkansas Medical Society* had recognized a provider right of action under Section 30(A), but did not take any steps to legislatively override those precedents. *See Cannon v. University of Chicago*, 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law"). And, while the Seventh Circuit did not have the benefit of the *Blessing* decision when it decided *Methodist Hospital* case, the Seventh Circuit did decide that *Suter* failed to require the denial of a private right of action, and the appeals court might conclude that *Blessing* goes no farther in that regard than did *Suter*.

This will make for interesting debate if (or, perhaps more accurately, when) this issue again reaches the Seventh Circuit. But at the present, *Methodist Hospitals* is the Seventh Circuit's last word on a provider's right of action under Section 30(A). And it is thus *Methodist Hospitals* and not *Evergreen* that controls this Court on the private right of action issue. We decline the defendant's invitation to disregard the clear holding of *Methodist Hospitals*, and we thus conclude that plaintiffs have a right to pursue this claim under Section 30(A).

## B.

We now turn to the part of *Methodist Hospitals* that plaintiffs dislike: that is, the part that holds that a state's compliance with Section 30(A) is measured not by predictions, but by results. The foregoing fact findings make plain why plaintiffs are discomfitted by that holding: in this case, all plaintiffs have so far are "dire predictions," which have not yet been "check[ed] . . . against reality." *Methodist Hospitals*, 91 F.3d 1030.

The plaintiffs' affidavits predict that the IDPA's new rates will lead to service cuts to Medicaid recipients – without providing too much detail about what those cuts will be. As explained above (*see* Findings Nos. 28-39, above), there are gaps in plaintiffs' evidentiary submissions that give the Court pause about whether service cuts are as unavoidable or substantial as the plaintiffs predict. Indeed, the uncertainty of those kinds of "dire predictions is one of the foundations of the *Methodist Hospitals* analysis. The Seventh Circuit doubted whether providers, if asked prior to the state implementing a new reimbursement formula, would (or could) provide "honest answers" if asked the price at which they would simply withdraw from the market rather than continue to provide service. 91 F.3d at 1029. We think this reasoning applies equally here, where providers challenge the rate after its implementation. We believe that *Methodist Hospitals* anticipates that during the pre-implementation stage, providers would have an incentive to overstate the effect of a proposed rate cut, so as to minimize the size of the cut. Likewise, in the post-implementation stage, providers have similar economic incentive to provide a worst case – rather than a most likely case – scenario as to the effect of a lower reimbursement rate.

This is not to suggest that the providers have no concern for the patients they serve, and are interested only in looting the state treasury. But it does reflect the reality that providers are interested in obtaining the highest reimbursement they can, just as the state is interested in obtaining services for the least amount of money possible. The considerations set forth in Section 30(A) provide the framework in which this tug of war is played out. Some of those considerations (such as, preventing unnecessary utilization and promoting efficiency and economy) may auger for a lower rate; others (such as ensuring quality of care) may auger for a higher rate. But equal access is – literally and figuratively – the bottom line of Section 30(A), and the measuring point for compliance with the statute.

And what *Methodist Hospitals* teaches is that in deciding among the conflicting claims about whether the reimbursement rate is sufficient to satisfy that standard, the test is not what is predicted but rather what happens – which is nothing more than application of the adage that actions speak louder than words. In *Methodist Hospitals*, the plaintiffs' Section 30(A) claim failed because, despite the dire predictions, there was no diminution in access. 91 F.3d at 1030. The predictions plaintiffs have made in this case are no less dire than those made in *Methodist Hospitals*, but the Court finds the evidence insufficient to establish a likelihood that the predictions will mature into reality.

That is not to say that plaintiffs' predictions may not prove correct. But there are far too many untested assumptions that we would have to make for the Court to say with confidence that the predictions have sufficient likelihood of maturing into reality.

*First*, the Court would have to accept that the providers who say they would diminish or eliminate services actually would do so rather than make belt-tightening cuts, even if that would cause them to lose non-Medicaid business that might be profitable. We do not believe the economic data supplied thus far sufficiently substantiates that assumption.

*Second*, the Court would have to assume that the providers who have not supplied affidavits stating that they would make cuts (who account for as much as 28 percent of the pharmaceuticals and related services to Medicaid patients) would fail to increase their provision of service to account for any decreases by other providers. No evidence has been offered that is sufficient to substantiate that assumption.

*Third*, even if the plaintiffs had made a sufficient showing that services to Medicaid patients would be decreased, we would have to assume that the resulting level of services would not be

equivalent to those available to non-Medicaid patients. We cannot make that assumption here, because the plaintiffs have neglected the non-Medicaid part of the equal access equation. In order to show a violation of equal access under Section 30(A), the plaintiffs must provide evidence of "the *recipients'* access and how it compares to the non-Medicaid population in the same geographic area." *Evergreen*, 235 F.3d at 934 (emphasis in original). But here, the plaintiffs have offered no evidence as to how the current level of service to non-Medicaid patients compares to the services that Medicaid recipients now have, and how that comparative access would change under the new reimbursement formula. This was the type of evidentiary shortcoming that the court in *Evergreen* found fatal to the plaintiffs' Section 30(A) claim:

> [T]here is no evidence from the plaintiffs that focuses on geographic areas and on the access to the different types of provider services available in those areas. In order for courts to make a determination whether recipients are receiving equal access to health care, there must be evidence in the record regarding the relevant geographic area, the services offered in the area, and the recipient's relationship to that area.

235 F.3d at 933. In that case, as here, the plaintiffs failed to offer sufficient evidence "addressing this concern; there are only allegations of general state-wide access problems, which is not sufficient for the [Court] to determine whether a recipient's access will actually be affected." *Id.*

*Fourth*, the Court would have to assume that the IDPA would fail to take action if the new reimbursement rates failed to result in an adequate supply of service. *Methodist Hospitals* makes plain that the IDPA has a duty to monitor the supply that results from the new rates, and must raise the price if experience shows that the supply is not adequate under Section 30(A). 91 F.3d at 1030 (if the rates set forth by the state result in inadequate supply, "the state may (*and under § 1396a(a)(30), must*) raise the price until the market clears") (emphasis added). In *Methodist Hospitals*, Indiana conducted studies

after the rates were implemented to determine their effect. We have not been provided with evidence as to what monitoring, if any, IDPA has conducted concerning the effect of the new rates. But we do know, from the pre-implementation notices, that IDPA says that it took public comments into consideration when promulgating the new rates. There is some proof that this was more than just words, as the proposed dispensing fee was increased after public comment received from the first notice (*see* Finding No. 21, above). Moreover, we know that the December 11, 2000 notice continued to solicit public comment on the rates, for a period that extended beyond the implementation date (*see* Finding No. 23, above). Plaintiffs have offered no evidence to persuade the Court to assume that the IDPA would not comply with its legal obligations to monitor the effect of its rates and, as necessary, to adjust them to assure an adequate supply of services.

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original), (quoting 11 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, at 129-30 (2d ed. 1995)). Although defendant has elected not to offer evidence to challenge plaintiffs' evidentiary submissions, that does not automatically render plaintiffs' submissions sufficient to show a likelihood of success. Unlike a motion for summary judgment, on a motion for preliminary injunction the evidence submitted must not merely be sufficient to support a reasonable inference in plaintiffs' favor, but it must also be sufficient to show some likelihood that the plaintiff in fact will win the case. *Mazurek*, 520 U.S. at 972 (the requirement for substantial proof is much higher on a motion for preliminary injunction than it is on a motion for summary judgment). The kind of assumptions that the Court would have to make here to find a

likelihood of success underscores that plaintiffs have failed to make the clear showing required for preliminary injunction relief.

## C.

Plaintiffs argue that the Court reads too much into *Methodist Hospitals*, and that the decision is not fatal to their claim for preliminary injunctive relief. For the reasons set forth below, we do not find those arguments convincing.

*First*, plaintiffs assert that in holding that a state need not "employ any particular methodology" in developing reimbursement rates, *Methodist Hospitals* did not relieve states of utilizing *some* methodology – and that the IDPA failed to do so here (Pls.' Reply Mem. 7). We find no language in *Methodist Hospitals* (and plaintiffs have pointed to none) that imposes a requirement that some methodology be employed in setting a rate. To the contrary, *Methodist Hospitals* says that a state simply may put out a price it is "willing to pay and see whether this brings forth an adequate supply." *See* 91 F.3d at 1030. *Methodist Hospitals* thus seems to impose no requirement of a pre-implementation methodology; instead, the case imposes on a state the post-implementation requirement of monitoring and adjusting the rate as necessary to prevent unequal access.

*Second*, plaintiffs argue that the revised reimbursement rates are "responsive solely to budgetary considerations," and that this is impermissible (Pls.' Mem. 16-18 and n. 2). That certainly is what some cases have said. *See, e.g., Rite Aid of Pennsylvania, Inc. v. Houstoun*, 171 F.3d 842, 856 (3rd Cir. 1999) ("budgetary considerations may not be the sole basis for a rate revision," but they "may be considered given that [the Act] mandates an economical result"). But, we find nothing in *Methodist Hospitals* that imposes such a limitation. To the contrary, we believe that the philosophical approach underlying *Methodist Hospitals* is inconsistent with such a limitation. A concern with whether budgetary

considerations are the sole (or instead a partial) basis for a reimbursement rate reflects a focus on the pre-implementation process employed to develop the rate. But *Methodist Hospitals* does not focus on pre-implementation process or motivation for a rate; rather, *Methodist Hospitals* focuses on the results. Thus, under *Methodist Hospitals*, the IDPA's new rates must stand or fall on the results they achieve, and on IDPA's monitoring and reaction to those results not on precisely what motivated the rate changes.

*Third*, plaintiffs argue that the rates are the result of "arbitrary and capricious" action by IDPA, and thus cannot survive (Pls.' Mem. 2, 9, 19-20). At the threshold, we believe that this is another argument related to process – and not results – that is foreclosed under *Methodist Hospitals*. And on this point, the Court notes that it is not alone in this reading of *Methodist Hospitals*.

In *Rite Aid*, the Third Circuit read *Methodist Hospitals* as eliminating any mandate for evaluation of the statutory factors *before* a state revises its rates, and thus allows a state to act like a private market participant: it may behave rationally, according to a plan that takes into account supply, demand and the various costs associated with that calculus; or it may behave irrationally, perhaps even "arbitrarily and capriciously." 171 F.3d at 852 and n.9. The Third Circuit thus recognized that the Seventh Circuit placed a limitation on a state that is not placed on private market participants: it required the state to review the effects of its rates and, if needed, to increase them to attract the level of service mandated by § 1396a(a)(30).

But the Third Circuit declined to adopt this approach because, in its view, "a state may not [ordinarily] act arbitrarily and capriciously, although other actors in the market may do so if they so choose." *Id.* And, "[w]hile section 30(A) does not govern the process by which its sets it prices, . . . other doctrines do control that process and protect the public from the possible ill effects of an agency

37

testing out new formulae or prices at random, then correcting the results *once a violation has occurred*." *Id.* (emphasis added). Rather, the *Rite Aid* court held that while a state is not required to conduct studies before setting a rate, the rate set may not be arbitrary or capricious, but must be based on a decision-making process that "is reasonable and sound." *Rite Aid*, 171 F.3d at 853.[18]

While the *Rite Aid* approach has some appeal, it is not the approach authorized by *Methodist Hospitals*. For the purposes of this case, the significance of the Third Circuit's analysis in *Rite Aid* is that it further confirms the broad sweep of the *Methodist Hospitals* holding: the most exemplary methodology will not save a rate that results in a lack of sufficient access that goes unaddressed, and the most flawed methodology (or the absence of any methodology at all) will not undermine a rate that attracts sufficient supply. Thus, under *Methodist Hospitals*, plaintiffs' attacks on the methodology employed by IDPA in developing a rate are futile.[19]

However, if there is any possible limitation on *Methodist Hospitals* it is here, on a challenge to the rate (not the process) as being arbitrary and capricious. Perhaps, under *Methodist Hospitals*, one would not need to await the marketplace's answer to the adequacy of a rate that was so unreasonable on its face (for example, zero) that it inevitably would fail to attract sufficient supply. But that

---

[18]In *Rite Aid*, the Third Circuit thus carved out a middle ground between the *Methodist Hospitals* and the approach of the Eighth and Ninth Circuits, which have held that § 1396a(a)(30) requires states to consider the relevant factors of equal access, efficiency, economy, and quality of care before setting rates. *See Arkansas Medical Soc'y, Inc. v. Reynolds*, 6 F.3d 519 (8th Cir. 1993); *Minnesota HomeCare Ass'n, Inc. v. Gomez*, 108 F.3d 917, 918 (8th Cir. 1997); *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491 (9th Cir. 1997).

[19]We point out that despite numerous assertions during the argument that were outside the record, the parties have offered little evidence as to how the IDPA actually went about developing the rates in question. Despite the Court's invitation on several occasions, the defendant declined to offer any evidence to shed light on this point – perhaps relying on *Methodist Hospitals* to relieve it of any obligation to do so. But, we do point out that there is evidence that in response to comments received concerning the initial rates proposed in the November 21 notice, that the IDPA increased the dispensing fee (Pls.' Ex. J). That evidence would suggest that the process of developing the rates was not as arbitrary as plaintiffs assert.

38

hypothetical case is not our case. Reimbursement at wholesale acquisition cost plus eight percent for

brand name and twelve percent for generic drugs is not on its face absurd. Indeed, three other states

use wholesale acquisition cost as a basis for reimbursement (*see* Finding No. 25, above). Nor is a flat

dispensing fee of $4.17 per prescription facially absurd – certainly not when that is more generous (or

less stingy) than the $4.00 dispensing fee that passed muster in *Rite Aid*. *See* 171 F.3d at 848. And,

indeed, at least one of the plaintiffs here says it would continue to generate positive net income on its

Medicaid business, even with the revised rate. For this and the other reasons that the Court has detailed

above, we do not believe the IDPA's rate would meet a standard of being so low on its face as to

inevitably fail to draw adequate supply.

*Fourth*, plaintiffs argue that *Methodist Hospitals* cannot really mean what it says, as it would

result in the inability to stop the harm that would result from inadequate rates – diminished access –

before it occurred. Although plaintiffs do not believe that this is what *Methodist Hospitals* means, the

Third Circuit read *Methodist Hospitals* in precisely that manner. And we cannot discount the

possibility that, in a given case, *Methodist Hospitals* could lead to that result. But, we do not think this

is such a case. The plaintiffs all have contracts both with IDPA and with the nursing homes and CILAs

in which the Medicaid recipients reside. Although the evidentiary submissions on these agreements

range from sparse (in the case of the IDPA contracts) to non-existent (in the case of the nursing home

and CILA contracts), the comments at oral argument make it clear that the providers would not be in

a position to modify or eliminate service without advance notice (*see also* Pls.' Mem. 15) ("Plaintiffs

will . . . honor existing contracts, and those not immediately cancellable or modifiable will be changed

or not renewed at the end of their term"). This suggests that there would be advance notice of any

substantial reduction in service, which would give other providers an opportunity to step in or the IDPA to adjust the rate (as it must, under *Methodist Hospitals*) if necessary to achieve an adequate level of service.[20]

*Fifth*, plaintiffs argue that even apart from the equal access requirement, they have an independent right to reasonable reimbursement. We agree that Section 30(A) envisions that providers will receive "reasonable reimbursement," but we disagree with plaintiffs' assertion (Pls.' Mem. at 12) that they have a stand-alone right to any particular level of reimbursement, untethered to the access by Medicaid recipients to services that the reimbursement yields. The Court views any right of reimbursement to providers as derivative of the right of patients to access to quality services. That is, if a particular provider decided that it did not receive sufficient Medicaid payments to remain in the business, the Court does not believe there would be a Section 30(A) violation if other providers stepped into the breach to provide equivalent services. We note that in *Methodist Hospitals*, the Seventh Circuit focused solely on whether there was a diminution in access to services by Medicaid patients. Finding none, the Court found no violation of Section 30(A), without making any further inquiry into the providers' level of satisfaction with the rates. In any event, the analysis in *Methodist Hospitals* suggests that were there any separate right by providers in receiving reasonable reimbursement, the measure of "reasonableness" would not be what providers say but instead what they do. Thus, if the rate attracts a sufficient supply of quality services for Medicaid patients, that would answer the question as to whether it was a "reasonable rate" for providers.[21]

---

[20]We do not find persuasive plaintiffs' assertion at oral argument that *Methodist Hospitals* does not apply because that case did not arise in the context of a motion for preliminary injunction.

[21]Plaintiff also argues that the prior rate was reasonable, as evidenced by the fact that it was in effect for nearly ten years (Pls.' Mem. 10), and that the new rates must therefore be unreasonable. The foregoing analysis disposes of

## CONCLUSION

For the foregoing reasons, plaintiffs have failed to show a sufficient likelihood of success on the merits to support their motion for preliminary injunction. As a result, and we need not address the other elements necessary to obtain such relief. *See Abbott Labs,* 971 F.2d at 11.

Although the holding in *Methodist Hospitals* spells defeat for the plaintiffs on this motion, the Court wishes to make it clear that we do not pass on the wisdom of the defendant's actions. For example, time will tell whether the new reimbursement formulas result in more Medicaid patients receiving care in a hospital setting at a higher than would be the case at nursing homes or CILAs, as predicted by some (*see* Pharmacy C Aff. ¶19) thus rendering the new formulas at a minimum penny wise but pound foolish.

We also emphasize that nothing in this opinion relieves the State of Illinois of its affirmative obligation under *Methodist Hospitals* to monitor the effects of the new reimbursement formulas in the marketplace. In opposing the motion for preliminary injunction, the defendant argued that the "only conceivable intended beneficiaries" of Section 30(A) are the state and federal governments (Def. Mem. 9); that Section 30(A) does not create any requirement of equal access, but only creates certain "goals" (*id.*, at 7-8); and that state is the arbiter of whether the prices it sets are adequate (*id.*, at 10). Suffice it to say that the Court disagrees with the extreme positions staked out by the defendant, which are inconsistent with *Methodist Hospitals*. If the new reimbursement rates prove too low, and if the plaintiffs are, indeed, closing their businesses or cutting their services in response to the rate to an

---

this argument. But in addition, even apart from the fact that the rate had been revised several times during that period (and reduced during a time in 1996), the longevity of the prior rate is irrelevant to its propriety: for all the Court knows, the prior rate was unreasonably high, and thus promoted overutilization and inefficiency.

extent that denies Medicaid recipients equal access, then the State has a duty under the Medicaid Act, to "raise the price until the market clears," *Methodist Hospitals* 91 F.3d at 1030. However, on the record now before the Court, the plaintiffs motion for preliminary injunction (doc. # 24-1) is denied.

ENTER:


SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated:  April 6, 2001**